# Exhibit A

1

2

3

4

5

6

7      **INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**

8                    **International Arbitration Tribunal**

9

10   SIMON PAINTER, an individual; TIMOTHY        Case No. 01-15-0005-6700
     LAWDON, an individual; TML
11   ENTERPRISES, PTY, LTD.; a business entity;   **FINAL AWARD**
     ASIA LIVE NETWORK, PTE, LTD., a
12   business entity; INTERNATIONAL SPECIAL
     ATTRACTIONS, LTD, a Colorado
13   corporation; THE WORKS
     ENTERTAINMENT, INC., a Nevada
14   corporation,
                    Claimants,
15              vs.
     BRETT DANIELS, an individual and BRETT
16   DANIELS PRODUCTIONS, INC., a business
     entity,
17                  Respondents.

18   BRETT DANIELS, an individual and BRETT
     DANIELS PRODUCTIONS, INC., a
19   Wisconsin corporation,
                    Counterclaimants
20
              vs.
21
     SIMON PAINTER, an individual; TIMOTHY
22   LAWSON, an individual; TML
     ENTERPRISES, PTY, LTD.; a foreign
23   corporation; ASIA LIVE NETWORK, PTE,
     LTD., a foreign corporation;
24   INTERNATIONAL SPECIAL
     ATTRACTIONS, LTD, a Colorado
25   corporation; THE WORKS
     ENTERTAINMENT, INC., a Nevada
26   corporation; MAGICSPACE
     ENTERTAINMENT, INC., a California
27   Corporation,
                    Counterclaim Respondents.

28

---
FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been duly designated in accordance with the arbitration agreement entered into between the above named-parties and dated June 25, 2012, and having been duly sworn, and having heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

Claimants and Counterclaim-Respondents Simon Painter; Timothy Lawson; TML Enterprises, Pty, Ltd.; Asia Live Network, Pte, Ltd.; International Special Attractions, Ltd.; and The Works Entertainment, Inc. (collectively, "Painter Parties") and Respondents and Counterclaimants Brett Daniels and Brett Daniels Productions, Inc. (collectively, "Daniels") arbitrated this dispute in Los Angeles, California before Robert C. O'Brien, arbitrator for the American Arbitration Association ("AAA")/International Centre for Dispute Resolution ("ICDR"). The in-person arbitration hearing commenced on November 13, 2017, and concluded on November 17, 2017, (the "Hearing"). The Parties appeared again before the Arbitrator on December 13, 2017, for closing arguments. The Hearing was closed by the Arbitrator and notice provided by the ICDR on February 15, 2018, following post-hearing written submissions.

After hearing the evidence, reviewing all pleadings submitted by the Parties, and examining the evidentiary record, the Arbitrator now makes the following findings and rulings.

I.     **INTRODUCTION**

This dispute concerns a live ensemble magic production titled *The Illusionists* ("*The Illusionists*" or the "Show") that premiered at the Sydney Opera House in January 2012 and continues to tour the world in several variations. The Painter Parties are the producers and presenters of *The Illusionists*. Brett Daniels, a professional magician and magic show producer, co-created the Show with claimant Simon Painter, and he performed as the "Grand Illusionist" in the Show from its Sydney premiere in January 2012 to July 2013.

In exchange for his efforts in co-creating and developing *The Illusionists*, Daniels asserts that he entered into a written agreement with the Painter Parties entitling him to a 10% share of the total amount paid to the Show's performers, in any variation of the Show (the "Creator Agreement"). The Painter Parties dispute that Daniels is owed any money under the purported Creator Agreement and, in turn, assert claims against Daniels for breach of agreements governing

1

his performances and for infringement of the Painter Parties' intellectual property.

## II.    PROCEDURAL HISTORY

### A.    Filings in United States District Courts

On November 9, 2015, Daniels filed claims against certain Painter Parties in the United States District Court for the Eastern District of Wisconsin ("Wisconsin Action").  In response, certain Painter Parties filed an arbitration demand and a statement of claims against Daniels with the AAA.  On November 16, 2015, certain Painter Parties also filed a Complaint and Motion to Compel Arbitration in the United States District Court for the Central District of California.  The Honorable Ronald S. W. Lew presided over the action filed in the Central District of California.  On May 27, 2016, the District Court in Wisconsin ruled on the Painter Parties' motion to dismiss or transfer venue; it ordered that the Wisconsin Action be transferred to the Central District of California.  On September 16, 2016, Judge Lew entered an order compelling arbitration of the Parties' claims.

### B.    ICDR Filings

Following the District Court's order compelling arbitration, no party challenged or objected to the jurisdiction of the Arbitrator or to the arbitrability of any claim or counterclaim.  On October 17, 2016, the Painter Parties filed a First Amended Statement of Claim in this arbitration.  The Painter Parties alleged claims for Breach of Written Contract, Violation of California's Talent Agencies Act (Labor Code § 1700 *et seq.*), Unfair Competition and False Advertising, Common Law Trademark Infringement, Common Law Trade Dress Infringement, and Declaratory Relief.  On November 15, 2016, Daniels filed counterclaims and a response to the Painter Parties' Frist Amended Statement of Claim.  Daniels' counterclaims included Breach of Oral/Written Contract, Conversion, Unjust Enrichment, Quantum Meruit, Copyright Infringement, Misappropriation of Trade Secrets, and Breach of Fiduciary Duty.[1]  On December 2, 2016, the Painter Parties filed an answer to Daniels' counterclaims.

---

[1] Since the filing of the Painter Parties' First Amended Statement of Claim and Daniels' Counterclaim, some claims have been withdrawn or re-characterized.  The Arbitrator relies on the Parties' Proposed Findings of Fact and Conclusions of Law to determine which claims are still in dispute.

**C.      The Arbitrator's Previous Orders**

On January 5, 2017, the Arbitrator issued his Preliminary Report Re Discovery Plan and Hearing Dates (Order No. 1).  Pursuant to the preliminary hearing on December 2, 2016, conducted by the Arbitrator and attended by the Parties' counsel, the Arbitrator ordered that the arbitration proceed under the AAA Commercial Arbitration Rules ("AAA Rules").  Order No. 1 also set forth a discovery plan and hearing dates that were formulated in consultation with the Parties.  Order No. 1 was later modified by an Amended Report Re Discovery Plan and Hearing Dates (Order No. 4).  Order No. 4 provided the Parties additional time to complete discovery and to prepare for the Hearing in this dispute.  Order No. 4 set the Hearing for November 13, 2017.

The Arbitrator issued Order No. 2 on June 25, 2017.  This order addressed the Painter Parties' Motion to Disqualify Greenberg Traurig LLP as Counsel of Record for Daniels.  The Painter Parties claimed that Daniels' counsel should be disqualified because it had provided, and continued to provide, legal counsel to a one-third owner of The Works Entertainment, Inc. ("The Works"), a Claimant and Counterclaim Respondent in this arbitration.  The Arbitrator held that The Works did not sufficiently establish standing to disqualify Daniels' counsel; and even if The Works had standing, it did not sufficiently allege facts justifying Daniels' counsel's disqualification.  Furthermore, any conflict of interest, the Arbitrator found, was "thrust upon" Greenberg Traurig as a result of happenstance, i.e., mergers and acquisitions.  The Arbitrator, however, noting the import of the duty of loyalty, ordered that Greenberg Traurig submit a declaration to the Arbitrator that unambiguously and explicitly confirmed that it terminated any attorney-client relationship with Kilburn Media, the one-third owner of The Works.  The Arbitrator also ordered that the declaration include a detailed explanation of the ethical screen implemented by Greenberg Traurig and that the declaration attach a copy of the letter sent by Greenberg Traurig to Kilburn confirming the termination of their attorney-client relationship.

The Painter Parties' assertion that Greenberg Traurig failed to comply with Order No. 2, in turn, caused the Arbitrator to issue Order No. 3 on August 7, 2017.  In this order, the Arbitrator ordered that Greenberg Traurig send a revised letter to Kilburn that explicitly stated that any previously existing attorney-client relationship between Greenberg Traurig and Kilburn had

ended.  Order No. 3 also ordered that Greenberg Traurig identify and list all of its attorneys and personnel who performed work on (1) this arbitration and (2) any Kilburn matters.  Greenberg Traurig subsequently complied with Order No. 3 on August 11, 2017, thereby mooting any argument that it should be disqualified as Daniels' counsel.

Order No. 5, issued on December 26, 2017, addressed Daniels' Motion to Compel Discovery or Exclude Evidence, and for Appropriate Sanctions.  The motion alleged that the Painter Parties improperly (1) withheld documents as privileged, (2) refused to produce documents from several named parties, (3) prevented deposition witnesses from testifying, and (4) failed to produce emails from two principal producers of the Show.  In his order, the Arbitrator declined to find adverse inferences against the Painter Parties or to issue monetary sanctions.  Instead, the Arbitrator noted that the lack of documentary evidence in support of the Painter Parties' claims and defenses was significant, and that the Painter Parties' discovery deficiencies go directly to the weight and persuasiveness of the Painter Parties' arguments in this case.  The Arbitrator stated that he will take the state of the documentary record into account in weighing all of the evidence submitted and arguments made in this case.

On February 15, 2018, the Arbitrator issued Order No. 6 Re the Painter Parties' objections to Daniels' attempts to introduce into evidence documents and deposition testimony after the Hearing.  The Painter Parties argued that Daniels' inclusion of documents and deposition testimony in Daniels' Proposed Findings of Fact and Conclusions of Law ("Daniels' Findings") that was submitted to the Arbitrator after the Hearing was improper.  Accordingly, the Painter Parties requested that the Arbitrator exclude the "non-admitted" evidence.  The Arbitrator held, however, that most of the evidence included in and attached to Daniels' Findings was "admitted" into evidence because all documents on the Parties' pre-hearing exhibit lists were "admitted."  Furthermore, the Arbitrator found that the deposition testimony, which was not "designated" before the Hearing, yet attached to Daniels' Findings, was not prejudicial to the Painter Parties because the Painter Parties attended the depositions and possessed the transcripts before the Hearing, and thus they had an opportunity to object, respond, or rebut the deposition testimony before Daniels relied on the testimony in his Findings.  The Arbitrator did state, however, that the

4

1    timing of the evidence's submission—after the Hearing's in-person sessions were concluded—

2    would be considered when the Arbitrator reviewed the record in preparation for issuing the Final

3    Award.

4        **D.**      **Motions *In Limine***

5        The Painter Parties submitted two motions *in limine* ("MIL") and Daniels submitted three

6    MILs to the Arbitrator.  The Arbitrator heard oral argument on the MILs at the hearing and took

7    them under submission.  Having considered the oral and written arguments offered by the Parties,

8    the Arbitrator finds as follows:

9            **i.**      **Painter Parties' Motions *In Limine***

10       A day before the Hearing, the Painter Parties submitted two MILs.  MIL # 1 sought to

11   exclude the testimony of Bill Smith, a "magic illusion builder" and "industry friend."  The Painter

12   Parties argued that because Daniels only disclosed its intent to have Mr. Smith appear as a

13   witness on November 6, 2017—days before the Hearing—and 8 months after the exchange of

14   initial witness disclosures in this arbitration, Mr. Smith should not testify at the Hearing.  The

15   Arbitrator denies the Painter Parties' MIL # 1.  Because the Painter Parties cross-examined Mr.

16   Smith during the Hearing, and because the Arbitrator deems Mr. Smith's testimony material and

17   non-cumulative, there is no reasonable basis to exclude consideration of his testimony.  *See* AAA

18   Rule 34(b) ("The arbitrator shall determine the admissibility, relevance, and materiality of the

19   evidence offered ….").

20       The Painter Parties' MIL # 2 sought to exclude the expert opinion testimony of Andrew

21   Farber.  The Painter Parties argued that Mr. Farber's testimony is not proper "expert opinion"

22   testimony under Federal Rule of Civil Procedure 702 as it "essentially seeks to argue Daniels'

23   case by offering improper speculation and conjecture on the reasonableness of the Painter Parties'

24   conduct and the meaning of the Creator Agreement."  Painter Parties' MIL # 2, at 3.  In

25   arbitration, "[c]onformity to legal rules of evidence [is] not necessary," and because the Arbitrator

26   finds that Mr. Farber's testimony is relevant and material to the dispute, the Arbitrator denies the

27   Painter Parties' MIL # 2.  *See* AAA Rule 34(a).

28

### ii.   Daniels' Motions *In Limine*

Daniels' MIL # 1 sought to exclude three of the Painter Parties' rebuttal experts: Jan Goren, Justin Sudds, and Jordan Fiksenbaum.  Daniels argued that the Painter Parties' "last-minute disclosure" of these experts—days before the Hearing—violated the operative scheduling order in this arbitration and caused prejudice to Daniels because Daniels could not adequately prepare for examination of these experts.  The Arbitrator notes that this argument echoes the Painter Parties' argument regarding the exclusion of Bill Smith as a testifying witness.  *See supra* Part II(D)(i).

The Arbitrator denies Daniels' MIL # 1.  Because Daniels had an opportunity to cross-examine these witnesses, and because the Arbitrator deems the experts' testimony material and non-cumulative, there is no reasonable basis to exclude consideration of the experts' testimony.  *See* AAA Rule 34(b) ("The arbitrator shall determine the admissibility, relevance, and materiality of the evidence offered ….").

Daniels' MIL # 2 sought to exclude the "irrelevant and improper evidence of Daniels' alleged misconduct."  More specifically, Daniels argued that as a result of the applicable statute of limitations, the only alleged "improper conduct" that is relevant to this arbitration is that which occurred during the Brisbane/Adelaide and Brazil tours in 2012 and 2013, respectively.  *See* Daniels' MIL # 2, at 3-4.  Daniels also sought to exclude hearsay and inadmissible character evidence pursuant to Federal Rule of Evidence 404(b).  *Id.* at 5.

The Arbitrator denies MIL # 2 and notes that the Federal Rules of Evidence need not be followed in this proceedings.  *See* AAA Rule 34(a).  The Arbitrator considered all evidence the Painter Parties deem material to their claim.  However, the Arbitrator is mindful of Daniels' statute of limitations, hearsay, and "improper character evidence" concerns, and such concerns will go to the weight, credibility, and persuasiveness of the Painter Parties' arguments.

MIL # 3 sought to exclude the legal opinions offered by the Painter Parties' Talent Agencies Act expert, Jeffrey Robin.  Daniels argued that Mr. Robin's expert report was a "textbook example of impermissible 'legal issue' opinion."  *See* Daniels' MIL # 3, at 3.  Daniels also asserted that Mr. Robin's report contained completely irrelevant opinions.  *See* MIL # 3, at 4.

In short, Daniels promulgated that Mr. Robin's opinion was an attempt to tell the Arbitrator how he should opine on the legal issues in this case.

The Arbitrator denies Daniels MIL # 3; therefore, the Arbitrator will not preclude consideration of Mr. Robin's testimony or his expert report in this arbitration.  The Arbitrator exercises his discretion to consider Mr. Robin's opinions and to determine if the opinions are material to this dispute and relevant to the resolution of the Parties' claims.

### E.    The Hearing

The in-person Hearing took place at the offices of Greenberg Traurig LLP located at 1840 Century Park East, Suite 1900, Los Angeles, CA 90067.  The Parties consented to the venue and were provided separate meeting places in addition to the hearing room.  Charles Harder and Jordan Susman of Harder Mirell & Abrams LLP represented the Painter Parties.  Tyler Andrews and Colin Fraser of Greenberg Traurig LLP represented Daniels. The following witnesses gave live testimony at the Hearing: Andrew Spencer, Dan Sperry, Jinger Kalin, Simon Painter, Neil Dorward, Jeff Robin, Bill Smith, Andrew Farber, Tim Lawson, and Brett Daniels.  The Parties also submitted deposition videos, transcripts, and voluminous exhibits in paper and electronic format to the Arbitrator.

## III.   FACTUAL BACKGROUND

### A.    The Parties

#### i.    *Claimants and Counterclaim-Respondents*

Simon Painter ("Painter") is a Santa Monica, California resident and is a producer and promoter of live events, including *The Illusionists*.  Daniels' Findings, at ¶ 4.  Beginning in 2011, Painter worked as the Creative Producer at International Special Attractions, Ltd. ("ISA"), a Colorado corporation and a Los Angeles-based producer of live events and theatrical productions.  *Id.* at ¶ 5.  As a Creative Producer, Painter was charged with developing new shows for ISA to produce, including *The Illusionists*.  *Id.*  Since at least 2012, Painter conducted his business through several corporate entities, including Singapore-based Asia Live Network ("ALN"), Singapore-based Works Creative Pte. Ltd., Singapore-based The Illusionists Live Limited Partnership, Great Britain-based The Illusionist Live UK Ltd., and Nevada-based The Works

7

Entertainment, Inc. ("The Works").  *Id.* at ¶ 6.

Painter collaborated with Australian-based promoter and producer of theatrical events Timothy Lawson ("Lawson") to produce *The Illusionists*.  *Id.* at ¶ 7.  Lawson, like Painter, conducted his business through several entities, such as Australian-based TML Enterprises, Pty, Ltd ("TML"), ALN, Singapore-based The Illusionists Live Limited Partnership, and Great Britain-based The Illusionist Live UK Ltd.  *Id.* at ¶ 8.

MagicSpace Entertainment, Inc. ("MagicSpace") is a promoter and live stage production company based in Utah.  *Id.* at ¶ 9.  MagicSpace and ALN entered into an agreement in 2013 for MagicSpace to promote and present *The Illusionists* for a term of three years.  *Id.* (citing TX 1200).  ALN and MagicSpace then extended their agreement through October of 2020.  *Id.* (citing TX 1201).  MagicSpace's wholly-owned subsidiary, The Illusionists North America, LLC, currently possesses the right to promote and present *The Illusionist*s.  *Id.* at ¶ 10 (citing TX 1201).

In 2017, the Painter Parties formed Illusionists Live LP, which purportedly holds and controls all the intellectual property rights and interests in *The Illusionists*.  *Id.* at ¶ 11.  Lawson testified at the Hearing that he and Painter, through their corporate entities, control at least two-thirds of Illusionists Live LP, and that this limited partnership would maintain responsibility for any award entered in this arbitration.  *Id.*

### ii.   *Respondents and Counterclaimants*

Brett Daniels is a Wisconsin resident and a professional magician, illusionist, and producer.  *Id.* at ¶ 2.  Since 2007, Daniels has conducted his business through his solely-owned corporate entity, Brett Daniels Productions, Inc., a Wisconsin corporation of which he is the sole shareholder.  *Id.* at ¶ 3.

### B.   <u>The Creation of *The Illusionists*</u>

In late 2010, Painter and Daniels began discussing the concept of creating a live ensemble magic show featuring a cohesive mix of the best magicians and illusionists in the world.  Painter and Daniels each believed that this concept was novel and had the potential for world-wide success.  *See* TX 646, 700, 701, 758, 995.  For example, as early as November 21, 2010, Painter asked Daniels to partner in creating a magic show with "MASSIVE opportunity for global

8

expansion" for which Daniels "would receive a percentage of future earnings."  TX 700.  Painter asked Daniels to "[d]esign the magic elements of the show" and "[b]e a business consultant / partner in the project."  *Id.*  On December 20, 2010, Painter predicted that this project would become a "GLOBAL sensation."  TX 701.

Daniels was involved, to varying degrees, in "every single step of the show's incarnation" and "played an integral role in the creation of the production."  TX 721.  Daniels "creat[ed], s[old], produc[ed], and br[ought] in the right talent as well as us[ed] all of [his] established contacts in the magic community to aid the production from its genesis."  TX 680.  In exchange, Daniels was promised "an ongoing amount equal to 10% of the act fee budget" for the Show in any of its variations in perpetuity.  *Id.*

In late April 2011, Painter and Daniels emailed about the critical importance of getting the Show "booked" at the Sydney Opera House, which would then enable them to "start looking at booking [the Show] as a tour possibly to play the rest of Asia, Australia, and then on to Europe."  TX 758.  Painter further told Daniels that the Show "is only going to fly if the Opera House books it, as it will basically pay for the show to be created, and from there [he] can launch it elsewhere," and that "there needs to be 3 versions of [*The Illusionists*] to accommodate all types of buyers, that way [he] can scale it for anyone that wants to buy it and [he and Daniels] don't have to turn down any money!"  *Id.*

On April 29, 2011, Andrew Spencer, then the Head of Commercial Programming at the Sydney Opera House, emailed to say Painter had "sold him on the idea" of an ensemble magic show at the Opera House, but that he still needed to "sell the idea" to other Sydney Opera House executives and board members.  TX 576.  Therefore, Spencer requested that Painter "put together a presentation … that sells the concept and enables people to visualize the show."  *Id.*  Painter immediately forwarded the request from the Sydney Opera House to Daniels and sought his input, stating, "Looks like we are nearly there."  *Id.*

Daniels helped assemble the requested presentation to sell the concept to the Sydney Opera House.  The majority of the presentation contained video footage from several of Daniels' previous television specials and advertisements from his prior magic shows.  TX 572, 573, 623.

Supplemental footage was obtained from various magicians Daniels recruited, including Dan Sperry, Jeff Hobson, and Andrew Basso.  TX 754, 755.  Daniels also recommended the digital editors for the pitch video and collaborated with Painter on the video's visual content, music, sound effects, background shots, and title in the weeks leading up to its submission to the Sydney Opera House in June of 2011.  *See* TX 568, 575, 574, 573, 572, 571, 623, 567, 566, 675.

Painter had tentatively titled the Show "Magique."  TX 623, 675 (video).  After Painter requested "any/all suggestions" on the video from Daniels (TX 623, 675), Daniels suggested additional potential names for the Show, presenting the name "ILLUS10NISTS" to Painter on May 24, 2011.  TX 712, 713, 716.  Painter responded to Daniels approvingly, stating "I think the name is UNREAL, featuring 10 of the World's Greatest Illusionists.  I am redoing it all now." TX 567.  The promotional video then changed its title from "Magique" to "The Illusionists" before its submission to the Sydney Opera House on May 31, 2011, and *The Illusionists* ultimately became the name of the Show.  TX 566.

Throughout June and July of 2011, Daniels and Painter continued planning, creating, and shaping the pending production.  During a three day trip to Las Vegas in July 2011, Painter introduced Daniels to his business partner and co-producer Lawson, and they pitched Lawson on the final concept and magic acts for the Show.  TX 551, 555.  In late August and early September 2011, Painter, Lawson, and Daniels travelled to Sydney, Australia to meet with executives from the Sydney Opera House to finalize details for the upcoming production.  TX 905, 906.  Daniels presented the Sydney Opera House executives with the "vision for the show," and provided input and updates on the plans for "running order, ideas about show design, music, final acts."  *Id.* After this successful meeting, the Sydney Opera House confirmed *The Illusionists* for its premiere during the January 2012 summer season.

Daniels continued his work on creating and finalizing details for the Show through September/October 2011.  On September 5, 2011, Painter sent Daniels a "list of things we need to do," which included "find a mentalist," "sort out photoshoot dates," "talk to TV people in LA," "talk through show running order and make matrix of acts," "speak to your band guys about music opportunities," and "start trying to sell the show elsewhere."  TX 824.

10

Neil Dorward, the director of the Show, became involved with *The Illusionists* in October 2011, nearly a year after the concept was conceived by Painter with the assistance of Daniels, and just three months prior to the Show's premiere.  TX 531.  After Dorward was brought on as the Show's director, Daniels worked with both Painter and Dorward to finalize the Show's development, running order, music, creative concepts, and all other aspects of the production.  TX 530, 518, 761.

*The Illusionists* premiered at the Sydney Opera House in January 2012 to sold-out shows and positive reviews.  Daniels performed in the Show as the "Grand Illusionist" and was compensated $12,500 per week during the Show's initial run at the Sydney Opera House per a written Performance Agreement with ISA.  CLMTS 6.  After the Show's premiere at the Sydney Opera House, Daniels continued his efforts to add new material, recruit new performers, and make substantial creative improvements to the Show.  TX 661, 589 (February 2012 emails from Dorward reflecting Brett's creative changes to the Show).

Following the success of the initial run at the Sydney Opera House, the Show's growth in multiple versions and markets began to materialize.  *See* Daniels' Findings, at ¶ 7.  Indeed, "[e]ncouraged by the [S]how's success in Sydney, [the] Painter Parties booked additional venues for *The Illusionists* [ ] around the globe, including Singapore in February 2012, Mexico in July 2012, South America (Ecuador, Colombia and Panama) in September 2012, Australia in January 2013, New Zealand in May-June 2013, and Brazil and Venezuela in June-July 2013.  Painter Parties' Proposed Arbitration Award ("Painter Parties' Findings), at 12 (¶ 50).

C.    **The Strained Relationship Between Daniels and the Painter Parties**

Daniels' Performance Agreements—the agreements that Daniels signed for each tour of the Show—contained a "Conduct and Behavior" clause that stated:

> The Artist shall at all times behave in a professional and ethical manner and adhere to the directions given to them in relation to the Production and shall do nothing, which is likely to bring the Artist, the Management, the Production or fellow Artists into disrepute or adversely affect the harmonious working equilibrium of the Production or the Company.

CLMTS 6, 7, 8, 9, 10.  Claimants submitted testimony suggesting that Daniels threw water bottles

11

in the presence of cast and crew (Painter Parties' Findings, at 17 (¶ 80); shouted profanities in the presence of cast and crew (*id.*); slammed doors in the presence of cast and crew (*id.*); made sexual advances on a crew member (*id.*); and propositioned other people as well (*id.*).  Furthermore, while Daniels was in Venezuela, he told Painter via a Skype call that he was going to break Painter's neck because Daniels believed that the Painter Parties were "screwing him."  *Id.* at 18-19 (¶¶ 82-83).  Daniels denied the allegations; nevertheless, Daniels' relationship with the Show's performers and the Painter Parties was undoubtedly broken.

Following Daniels' return from Venezuela on or about July 25, 2013, Daniels ceased performing for *The Illusionists* and did not enter into any additional Performance Agreements. *Id.* at 19 (¶ 85).  The Painter Parties also ceased paying Daniels his 10% act fee under the Creator Agreement in November 2013.  *Id.* at 19 (¶ 86).

### D.   Shows Created After Daniels' Departure From *The Illusionists*

"After the success of the original *The Illusionists: Witness the Impossible* show, and well after Daniels had left the show, [the] Painter Parties developed other magic shows …, namely: (a) *The Illusionists 2.0 The Next Generation of Magic* – launched 2014; (b) *The Illusionists 1903: The Golden Age of Magic* – launched 2015 (later renamed *The Illusionists: Turn of the Century* in 2016); and (c) *The Illusionists: Live on Broadway* – launched 2015 (later renamed *The Illusionists: Live From Broadway*, once it left Broadway).  Painter Parties' Findings, at 22 (¶ 100).

Daniels claims that the aforementioned shows are variations of *The Illusionists*, and that such variations fall under the Creator Agreement, entitling Daniels to 10% of the total, cumulative act fee budget.  *See* Daniels' Findings, at ¶¶ 88-91.

In May 2014, Daniels "produced a different ensemble magic show entitled *The Revollusionists: Experience the Impossible* which played in Branson Missouri for two months." *Id.* at 20 (¶ 93).  Because the *The Revollusionists* failed after only two months, Daniels claims that he lost money on the production when his business partner engaged in fraudulent activity. Daniels' Findings, at ¶ 350.

The Painter Parties claim that *The Revollusionists*' marketing looked similar to the

marketing used by *The Illusionists* (*Id.* at 21 (¶ 98)), and thus Daniels infringed on *The Illusionists*'—the Painter Parties'—intellectual property rights.

**IV.   ANALYSIS**

    **A.   Legal Rules**

The Performance Agreements (CLMTS 6, 7, 8, 9, 10) at issue in this arbitration state: "In the event of any dispute or controversy arising out of or in any way in connection with the Agreement, such dispute or controversy shall be settled exclusively by arbitration in Los Angeles, California, in accordance with the arbitration rules of the American Arbitration Association."

Judge Lew found that "[g]iven the 'liberal federal policy favoring arbitration agreements,' [citation] a court can reasonably interpret a broad clause to cover all disputes between the parties." *Daniels et al. v. Painter et al.*, CV-16-03782-RSWL-Ex, Dkt. No. 67, at *10 (C.D. Cal. Sept. 16, 2016). The court held that "both parties intended to arbitrate 'any and all claims' arising from Daniels's contributions to The Show in its entirety, whether claims stemming from Daniels's duties as a stage performer or as a purported 'co-creator.'" *Id.* at * 11. Indeed, the court held that were it to "subscribe to [Daniels's] specious dichotomy between [his] role as a performer and co-creator, this would effectively gut the parties' intent to draft a facially broad arbitration clause … because [the Parties] intended the facially broad clause to encompass all *Illusionists*-related claims." *Id.* at *15.

In light of the court's ruling and consistent with his inherent powers in the case, the Arbitrator finds that he has jurisdiction to resolve the entire dispute between the Parties. *See* AAA Rule 7(a), (c) ("the arbitrator shall have the power to rule on his or her own jurisdiction" and "[a] party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection.") No party has challenged or objected to the jurisdiction of the Arbitrator or to the arbitrability of any claim or counterclaim. Painter Parties' Findings, at 4.

Pursuant to the AAA Rules, "[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties." AAA Rule 47(a). In his final award, the "arbitrator shall assess the fees, expenses, and compensation

… among the parties in such amounts as the arbitrator determines is appropriate."  AAA Rule 47(c).  The final award may include "interest at such rate and from such date as the arbitrator[ ] may deem appropriate; and [ ] an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement."  AAA Rule 47(d).

The California Supreme Court has stated that "arbitrators, unless expressly restricted by the agreement or the submission to arbitration, have substantial discretion to determine the scope of their contractual authority to fashion remedies, and that judicial review of their awards must be correspondingly narrow and deferential."  *Advanced Micro Devices, Inc. v. Intel Corp.*, 9 Cal. 4th 362, 376 (1994).  Indeed, arbitrators have broad discretion in fashioning a remedy for the injustice that is found to have occurred and they may grant equitable relief that a court could not.  *See Greenspan v. Ladt, LLC*, 185 Cal. App. 4th 1413, 1448 (2010).  In short, "[a]bsent an express and unambiguous limitation in the contract or the submission to arbitration, an arbitrator has the authority to find the facts, interpret the contract, and award any relief rationally related to his or her factual findings and contractual interpretation."  *Gueyffier v. Ann Summers, Ltd.*, 43 Cal. 4th 1179, 1182 (2008) (citations omitted).

Daniels emphasizes the Arbitrator's power in this matter by noting:

> [T]he arbitration clause in the Performance Agreements authorizes the Arbitrator to decide this matter "in accordance with the arbitration rules of the American Arbitration Association" without limitation.  (*See e.g,* CX 10).  Thus, the Arbitrator has the broadest possible authority to decide this case and fashion remedies.

Daniels' Findings, at ¶ 239.

The Painter Parties also recognize the breadth of the Arbitrator's power.  Citing to AAA Rule 47(a)-(d), the Painter Parties state that the Arbitrator may "award any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties … award interest … [and] apportion fees and expenses."  Painter Parties' Findings, at ¶¶ 1-3.

14

### B.   Daniels' Claims

#### i.   *Breach of Contract—The Creator Agreement*

Daniels alleges that he and the Painter Parties entered into a valid contract—the Creator Agreement—that obligates the Painter Parties to pay Daniels 10% of the total, cumulative act fee budget from the Show and the Show's variations. The Creator Agreement, according to Daniels, bound all the Painter Parties, required the Painter Parties to pay Daniels his 10% fee, and placed no "measures of expectation" on Daniels, other than his role in co-creating and developing *The Illusionists*. Accordingly, Daniels asserts that a valid contract exists—the Creator Agreement, and the Painter Parties have breached said agreement by withholding monies owed to Daniels.

"To prevail on a cause of action for breach of contract, the plaintiff must prove: (1) the contract, (2) plaintiff's performance of the contract or excuse for nonperformance, (3) defendant's breach, and (4) resulting damage to the plaintiff." *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014). "If the meaning a layperson would ascribe to the contract language is not ambiguous, there is no place for interpretation and the court must simply apply that meaning." *Chatton v. National Union Fire Ins. Co.*, 10 Cal. App. 4th 846, 853 (1992). In other words, "courts will not adopt a strained or absurd interpretation to find an ambiguity where none exists." *Id.*

Following the Sydney Premier of the Show, Daniels requested that the Painter Parties execute a formal, written agreement memorializing Daniels' entitlement to the 10% fee. *See, e.g.* TX 590, 680, 843, 849, 857). For example, in an email dated February 24, 2012, between Daniels and Painter, Daniels stated "[a]s we discussed many times, this is a quid pro in exchange for my being involved in creating, selling, producing and bringing in the right talent as well as using all of my established contacts in the magic community to aid the production from its genesis." TX 680. Daniels further explained the reason for the 10% fee: "this 'fee' is in essence, in exchange for my not taking a 'piece' of the show, or a fee of any kind in acting as the initial illusion director—as well as being involved in all concept creation, etc… and as such, an ongoing amount equal to 10% of the act fee budget is in place." *Id.* On March 12, 2012, Daniels emailed Painter again stating that "[he] must respectfully press the point and ask [Painter] to please settle the time

15

sensitive issues that remain to be dealt with …. the issue of a more detailed understanding between [Painter] and [Daniels] regarding [the 10% fee].  TX 857.

In Daniels' March 15, 2012 email to Painter, Daniels included the below writing in the body of the email and asked Painter "are we 'in agreement' on the language …."

> This is an agreement between Brett Daniels Productions, Inc. and the 'producers' of 'The Illusionists' aka/ 'Simon Painter/ISA/Tim Lawson' and shall include any other entities they bring into, or work through, in presenting the theatrical product known as 'The Illusionists' in any of its variations.  Brett Daniels Productions, Inc. shall receive, on an ongoing basis, in perpetuity, 10% of the total 'act fee budget.' The 'act fee budget' shall be defined as the total cumulative amount that the 'magic based acts' are contracted for to appear in the production.  This fee, shall be authorized by the 'producers' and paid by 'acts'—unless, in certain cases, due to 'producers' independent preference, producers choose to not burden a particular 'act' with this fee, in which case 'producers' shall pay this (10% act) additional fee to directly to Brett Daniels Productions, Inc.

TX 680.

Painter responded, "Ok. All agreed with [T]im and I …" in answering Daniels' March 15, 2012 email regarding whether the above-writing may be approved as a contract.  *Id.*

The Arbitrator must determine whether the above writing constitutes a Creator Agreement, i.e., a contract, between Daniels and the Painter Parties.  The Arbitrator finds that the above writing—the so-called Creator Agreement—is a valid contract.  TX 680.  The clear and unambiguous terms of the Creator Agreement guide the Arbitrator's resolution of this dispute. Pursuant to the Creator Agreement, Brett Daniels Productions, Inc., Simon Painter, Tim Lawson, ISA, and "any other entities they bring into, or work through[;]" such as TML, The Works, ALN, Illusionists Live LP, and MagicSpace[2] are bound by the Creator Agreement's terms.  Pursuant to the Creator Agreement, Daniels "shall receive, on an ongoing basis, in perpetuity, 10% of the total 'act fee budget'" for *The Illusionists* "in any of its variations."  TX 680.

---

[2] MagicSpace, by ALN's agreement and consent "c/o Tim Lawson and Simon Painter," has produced and presented The Illusionists since September 18, 2013, and continues to do so.  TX 1200, 1201.  Pursuant to its ongoing agreement with ALN, MagicSpace is required to "promote and present" the Show and provide "payroll, logistics, and tour management, marketing, advertisement, accounting, contracting and negotiation" services for the Show.  TX 1200.  Furthermore, in 2015, in the Wisconsin Action, the Painter Parties sought dismissal of the lawsuit by arguing that MagicSpace actually controlled the Show, including the finances and budgets from which the 10% fee to Daniels would be determined, and that the Painter Parties were mere "profit participants."  Daniels' Findings, at ¶ 47 (citing to Painter Parties' Reply in Support of Their Motion to Dismiss).  Further, because MagicSpace did not appear at the Hearing to present a defense to Daniels' claims, the Arbitrator finds that it cannot now argue that it is not bound by the Creator Agreement.

16

The record before me demonstrates that the Painter Parties assumed the responsibility to pay Daniels his 10% fee.  *See, e.g.,* TX 774 (Painter stated, "I can get you paid and everything taken care of as soon as we work out who owes you what.. no problem at all"); TX 696 (Painter stated, "I'll sort out any outstanding money . . . 100% you will get it . . . I'm not going to screw you. You are a big part of this show"); TX 805 (Painter stated, "If there is any more owed [Tim] will pay it.  Who else do you need me to push[?]  What else do I owe you from before (Mexico) can u list in one email[?]").  TX 805.  Notably, Daniels negotiated the 10% fee *with the Painter Parties*, not the Show's performers, further confirming that the Painter Parties remained responsible for ensuring Daniels received compensation owing to him.  Indeed, after removing Daniels as a performer in the Show in 2013, the Painter Parties continued to recognize their ongoing responsibility to pay Daniels under the Creator Agreement.  *See* TX 684 (Daniels asked Painter and Lawson, "Am I correct in understanding that your decision to remove me from the show does not affect my 'stake'—10% act fee?"  Lawson responded that same day, "Of course the act fee remains.").

The Arbitrator finds that the Painter Parties' efforts to have the performers pay Daniels his 10% fee directly did not obviate the Painter Parties' ultimate responsibility to ensure that Daniels received his fee, especially considering that the Painter Parties "authorized" the fee and maintained accounting records, including the total act fee budget from where the 10% fee would be calculated.  TX 680.  Furthermore, the Show's performers understood that the Painter Parties were responsible for Daniels' 10% fee.  *See* Daniels' Findings, at ¶¶ 73-75 (providing deposition testimony from the Show's performers stating that the Painter Parties were responsible for the 10% fee to Daniels).

Daniels performed all requirements under the Creator Agreement to entitle him to his 10% fee.  The record before the Arbitrator establishes that Daniels co-created, developed, and recruited the necessary talent to the Show.  Daniels' Findings, at ¶¶ 112-15.  Painter and Lawson themselves credited Daniels for co-creating the Show.  For example, in the Show's World Premiere Souvenir Program they wrote: "Thanks again to Brett for not only encouraging the artists' contribution, but for being there for us every single step of the show's incarnation."  TX

17

721. Painter and Lawson also wrote: "We were incredibly fortunate that not only did the Sydney Opera House share our vision, but also Brett Daniels, the master of Grand Illusion, who played an integral role in the creation of the production." *Id.*

The Arbitrator does not find credible the Painter Parties' argument that the Creator Agreement was void due to Daniels' failure to meet unwritten "measures of expectation." There is only one document in the record that discusses "measures of expectation." *See* TX 864. That single document, an email between Painter and Daniels, shows that Daniels "agre[ed] to fulfill a role to submit acts," what he termed a "measure of expectation." *Id.* Daniels fulfilled this obligation. *See, e.g.*, Daniels' Findings, at ¶ 19 (deposition testimony from the Show's performers confirms that it if wasn't for Daniels' involvement in the Show, his talent, and his reputation in the industry, many performers would not have signed up for the Show).

The record before the Arbitrator does not provide any other indication of additional "measures of expectation" placed on Daniels. Most importantly, the Creator Agreement contains no reference to "measures of expectation." TX 680. Therefore, the Arbitrator cannot find that any alleged "measures of expectation" were incorporated by reference into the Creator Agreement. *See Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1331 (2009) ("For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties.").

Accordingly, the Arbitrator agrees with Daniels' that he fulfilled all of his obligations under the Creator Agreement to receive his 10% fee. *See* Daniels' Findings, at ¶ 81.

The Arbitrator also interprets the phrase "the theatrical product known as 'The Illusionists' in any of its variations" to include: (i) *The Illusionists: Witness the Impossible*, (ii) *The Illusionists 2.0*, (iii) *The Illusionists 1903*, also known as *The Illusionists: Turn of the Century*, (iv) *The Illusionists: Live on Broadway*, (v) *The Illusionists: Live from Broadway*, and (vi) *The Illusionists Presents Adam Trent*. Daniels' Findings, at ¶¶ 88-91. Indeed, the magicians selected by the Painter Parties to testify at the Hearing confirmed that the above-listed shows

18

constituted variations of *The Illusionists*.  Daniels' Findings, at ¶ 101.  Furthermore, during the creation of *The Illusionists*, Painter told Daniels that "there needs to be 3 versions of this show to accommodate all types of buyers, that way I can scale it for anyone that wants to buy it and we don't have to turn down any money!"  TX 758.  In other words, Painter discussed the creation of multiple Illusionist-type shows with Daniels at the outset of the Show's creation.  Therefore, the Arbitrator does not find persuasive or credible the Painter Parties' argument that the phrase "'*The Illusionists' in any of its variations*," as used in the Creator Agreement, was meant to apply only to potential cast member changes in a single variation of the Show—*The Illusionists: Witness the Impossible*.  Importantly, the Painter Parties have not produced documentary evidence in support of this argument.

Furthermore, the Creator Agreement contains no requirement or obligation that Daniels "contribute" to future variations of the Show to receive his agreed upon fee.  TX 680.  Finally, testimony during the Hearing confirmed that Painter, Lawson, Dorward, and the Sydney Opera House continue to receive royalties (or similar payments) from the Show.  Only Daniels, who like the aforementioned persons and entity was there from the outset and helped propel the Show to success, has been deprived of ongoing payments.

In sum, the Creator Agreement is not limited to the versions of the Show to which Daniels contributed and, in fact, expressly applies to the theatrical product known as 'The Illusionists' in any of its variations."  TX 680.  Thus, Daniels is entitled to 10% of the total, cumulative act fee budget for all variations of *The Illusionists*.

The Painter Parties breached the Creator Agreement on or about November 13, 2013, when they ceased routinely paying Daniels his 10% fee.  *See* TX 719; Howdeshell Report, Ex. 4.  As evidenced by Daniels' various communications to the Painter Parties, the Painter Parties breached the Creator Agreement when they stopped or unreasonably delayed payments to Daniels.  *See* Daniels' Findings, at ¶ 123; TX 509 ("You are SEVERELY delinquent in Payments.  I have been patient and reasonable, as always, but your continued nonpayment and REFUSAL to remedy this situation will leave me with no course of action other than litigation.").  Because the Painter Parties' claims for denying the existence, voiding, or excusing their non-

19

performance under the Creator Agreement are denied, the Painter Parties breached their

obligations under the Creator Agreement—namely paying Daniels his 10% fee.

Daniels' damages are calculated *infra*, at Section IV(D)(i), and the Arbitrator's findings

regarding Daniels' claim for declaratory relief may be found at Section VII.

### ii.     Breach of the Covenant of Good Faith and Fair Dealing

Daniels states that his breach of the covenant of good faith and fair dealing claim is plead

"as an alternative to his breach of contract claim."  Daniels' Findings, at ¶ 145.  While the factual

record provides ample support in favor of granting Daniels' breach of the covenant of good faith

and fair dealing claim, the Arbitrator denies Daniels' claim because Daniels succeeded on his

breach of contract claim.  *See, e.g., Careau & Co. v. Security Pac. Bus. Credit, Inc.*, 222 Cal.

App. 3d 1371, 1395 (1990) ("If allegations do not go beyond the statement of a mere contract

breach and, relying on the same alleged acts, *simply seek the same damages* or other relief already

claimed in a companion contract cause of action, they may be disregarded as superfluous as no

additional claim is actually stated.") (emphasis added).

### iii.     Unjust Enrichment and Quantum Meruit

Daniels alleges that his unjust enrichment and quantum meruit claim is plead as an

"equitable alternative to his breach of contract claim."  Because the Arbitrator granted Daniels'

breach of contract claim, the Arbitrator denies Daniels' unjust enrichment and quantum meruit

claim.  *See Tavaglione v. Billings*, 4 Cal. 4th 1150, 1158-59 (1993) ("Regardless of the nature or

number of legal theories advanced by the plaintiff, he is not entitled to more than a single

recovery for each distinct item of compensable damages supported by the evidence.  Double or

duplicative recovery for the same items of damage amounts to overcompensation and is therefore

prohibited.") (citations omitted).

### iv.     Breach of Fiduciary Duty

Daniels claims that because he and the Painter Parties combined property, money, effects,

skill, and knowledge for the purpose of creating *The Illusionists*, a fiduciary relationship "was

thereby created between Daniels and the Painter Parties as joint adventurers in *The Illusionists*."

Daniels' Findings, at ¶¶ 202, 203.  Daniels further alleges that the Painter Parties breached their

20

fiduciary duties to Daniels by: (a) failing to pay Daniels; (b) concealing and failing to discuss the Creator Agreement and Daniels' fee with the acts; (c) intentionally plotting to exclude Daniels from the Show; (d) intentionally plotting to repudiate Daniels' financial interest in the Show through contrived means; (e) blocking Daniels' access to information about the Show; and (f) ignoring Daniels' repeated requests for payment and information. *See* Daniels' Findings, at ¶ 209.

"A fiduciary relationship is any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party." *Wolf v. Superior Court*, 107 Cal. App. 4th 25, 29 (2003) (internal quotations omitted); *see also Rickel v. Schwinn Bicyle Co.*, 144 Cal. App. 3d 648, 654 (1983) ("A 'fiduciary relation' in law is ordinarily synonymous with a 'confidential relation.' It is ... founded upon the trust or confidence reposed by one person in the integrity and fidelity of another, and likewise precludes the idea of profit or advantage resulting from the dealings of the parties and the person in whom the confidence is reposed.") (internal quotations omitted).

For example, in *Wolf v. Superior Court*, the plaintiff entered into a written agreement with Disney in which the plaintiff assigned to Disney the rights to a novel and the Roger Rabbit characters. *Wolf*, 107 Cal. App. 4th at 27. In exchange, Disney agreed to pay the plaintiff a stated, fixed compensation upon execution of the agreement; a percentage of the "net profits;" and additional, contingent compensation in the amount of 5 percent of any future gross receipts Disney earned from merchandizing or other exploitation of the Roger Rabbit characters. *Id.* at 28. The plaintiff alleged in his complaint that Disney breached its fiduciary duty to him by underreporting revenues it received in connection with the Roger Rabbit characters and failing to disclose the nature of its third-party agreements concerning the characters and the compensation received. *Id.*

The court held that "the contractual right to contingent compensation in the control of another has never, by itself, been sufficient to create a fiduciary relationship where one would not otherwise exist." *Id.* at 30-31 (collecting cases). The court also held:

Equally without merit is [the plaintiff's] contention that a fiduciary relationship

21

exists because [the plaintiff] necessarily reposed 'trust and confidence' in Disney to perform its contractual obligation—that is, to account for and pay [the plaintiff] the contingent compensation agreed upon in the contract.  Every contract requires one party to repose an element of trust and confidence in the other to perform.  For this reason, every contract contains an implied covenant of good faith and fair dealing, obligating the contracting parties to refrain from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruit of the contract ….  Being of universal prevalence, [the implied covenant] cannot create a fiduciary relationship; it affords basis for redress for breach of contract and that is all.

*Id.* at 31 (internal citations and quotations omitted).  The court further noted that an agreement providing for certain and contingent compensation to a beneficiary, and where the parties to the contract had no expectation to "maximize profits," cannot be interpreted as creating a fiduciary relationship.  *Id.* at 32.  Finally, the court held that the contractual right to an accounting does not convert an arm's length transaction into a fiduciary relationship.  *Id.* at 35.

The Arbitrator finds the reasoning in *Wolf* persuasive and applicable to this dispute.  The gravamen of Daniels' breach of fiduciary duty claim is that the Painter Parties failed to honor their contractual obligation to pay Daniels 10% of the total act fee budget from the Show and its variations.  *See, e.g.* Daniels' Findings, at ¶ 192.  The fact that Daniels placed "trust" in the Painter Parties to honor their contractual obligations after Daniels' exit from *The Illusionists* does not transform an arms-length, future compensation agreement into a fiduciary relationship between the Parties.  *See Wolf*, 107 Cal. App. 4th at 31.

Indeed, the Painter Parties had no obligation to maximize Daniels' profits, as is typically required in a fiduciary relationship; instead, their only obligation was to pay Daniels 10% of the total act fee budget for the Show and its variations.  Under such circumstances, courts have denied the existence of a fiduciary relationship and instead interpreted such arrangement as one sounding in contract only.  *See id.* at 3; *see also Recorded Picture Co. v. Nelson Ent't*, 53 Cal. App. 4th 350, 370 (1997) (holding that a contract negotiated at arm's length does not create a fiduciary relationship between the parties and neither does a debt obligation create a fiduciary relationship).

Furthermore, Daniels' breach of fiduciary duty claim is focused on the Painter Parties conduct *after* Daniels was removed from the Show and *after* Daniels performed all acts required on his part to secure 10% of the total act fee budget for future variations of the Show.  *See, e.g.*

22

Daniels' Findings, at ¶ 195 ("After removing him from the Show, the Painter Parties not only broke their promise to Daniels regarding his ongoing compensation, they also retaliated against Daniels to prevent him from collecting his fees from other sources …."); *id.* at ¶ 81 ("I believe I have already fulfilled that measure (which allows me to receive 10% of act fees ongoing) previously by being involved in the creation of the entity …."). The fiduciary duty owed to *former* partners is "to share the benefits of existing partnership business opportunities," i.e., "partnership opportunities extant at the time [the partner] left the partnership." *See Crouse v. Brokeck, Phelger & Harrison*, 67 Cal. App. 4th 1509, 1551 (1998).

Accordingly, the Arbitrator denies Daniels' breach of fiduciary duty claim.

### v.   *Copyright Infringement*

Daniels' Findings did not include a claim for Copyright Infringement because it was withdrawn. In Daniels' "Response Comments" letter submitted to the Arbitrator and the Painter Parties on January 12, 2018, Daniels noted that the copyright claim was withdrawn "not due to lack of merit, but only after careful consideration of the limited time and resources available during the Hearing, the relatively low amount of potential provable damages, and the preliminary comments of the Arbitrator." *See* Daniels' Response Comments Letter, at 3.

The Painter Parties, in turn, argue that they are the prevailing party on this claim and should be awarded attorneys' fees for defeating Daniel's copyright claim.

Under 17 U.S.C. § 505, "attorneys' fees are to be awarded to prevailing parties only as a matter of the court's discretion." 13 Witkin, Summary of California Law, 11th ed. Pers. Prop. § 77 (2017). The court's discretion "is triggered only if the party in fact *prevailed* on the copyright claim." *Cadkin v. Loose*, 569 F.3d 1142, 1147 (9th Cir. 2009) (emphasis added). The United States Supreme Court, in *Buckhannon Bd. And Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, concluded that "a 'prevailing party' is one who has been awarded some relief by the court." 532 U.S. 598, 603 (2001). "The key inquiry is whether some court action has created a 'material alteration of the legal relationship of the parties.'" *Cadkin*, 569 F.3d at 1148 (quoting *Buckhannon*, 532 U.S. at 604).

*Cadkin* concerned whether a defendant was entitled to attorney's fees as a prevailing party

23

under the Copyright Act. *Id.* at 1144. The plaintiff voluntarily dismissed his copyright claims. *Id.* The Ninth Circuit held the "voluntary dismissal does not alter the legal relationship of the parties because [the defendant] remain[s] subject to the risk of refiling following a dismissal without prejudice." *Id.* at 1149. *Cadkin* is instructive here.

Daniels voluntarily withdrew his claim on January 12, 2018, *before* the Arbitrator issued any award concerning Daniels' copyright claim. Therefore, the Arbitrator did not "materially alter" the legal relationship between the parties. Given these facts and procedural history, the Painter Parties cannot be considered a "prevailing party" under § 505. Therefore, the Painter Parties' request for $89,729 in attorneys' fees is denied.

### C. Painter Parties Claims

#### i. *Breach of Written Contract*

The Painter Parties and Daniels entered into five written Performance Agreements: (1) Agreement with ISA regarding Daniels' performances at the Sydney Opera House in January 2012 (CLMTS 6, TX 1001); (2) Agreement with ISA regarding Daniels' performances on a Latin American tour between July and August 2012 (CLMTS 7, TX 998); (3) Agreement with ALN regarding Daniels' performances on a South American tour between September and October 2012 (CLMTS 8, TX 999); (4) Agreement with ALN regarding Daniels' performances on an Australian tour between December 2012 and January 2013 (CLMTS 9, TX 1000); and (5) Agreement with ALN regarding Daniels' performances on a Brazil tour May-July 2013 (CLMTS 10, TX 997).

Each Performance Agreement included a Conduct & Behavior clause that provided:

> The Artist shall at all times behave in a professional and ethical manner and adhere to the directions given to them in relation to the Production and shall do nothing, which is likely to bring the Artist, the Management, the Production or fellow Artists into disrepute or adversely affect the harmonious working equilibrium of the Production or the Company.

*Id.*

The Painter Parties allege that Daniels breached the Conduct & Behavior clause by screaming profanities at his co-workers, throwing chairs and bottles, engaging in illicit sexual and

24

harassing behavior with female crew members and partners, and threatening to break Painter's neck. Painter Parties' Findings, at 27, ¶ 5.

a) <u>Daniels' Alleged Violation of the Conduct & Behavior Clause Did Not Invalidate the Creator Agreement</u>

The Painter Parties assert that Daniels' disruptive behavior—his purported violation of the Performance Agreements' Conduct & Behavior Clauses—invalidated the Creator Agreement. In other words, the Painter Parties argue that the Performance Agreements' Conduct & Behavior clauses were incorporated into the Creator Agreement, and violation of any of the Conduct & Behavior clauses resulted in Daniels invalidating the Creator Agreement.

The record before me, however, does not establish that (1) the Painter Parties told Daniels they intended the Conduct & Behavior clause or any outside terms to be incorporated into the Creator Agreement; (2) that Daniels agreed to incorporate the Conduct & Behavior clause into the Creator Agreement; or (3) that Daniels knew that there were additional terms outside the Creator Agreement that the Painter Parties intended to incorporate. *See Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1331 (2009) ("For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties."); *see also Scott's Valley Fruit Exch. v. Growers Refrigeration Co.*, 81 Cal. App. 2d 437 (1947).

In other words, the Performance Agreements' Conduct & Behavior clauses were never incorporated into the Creator Agreement. As a result, a breach of any of the Conduct & Behavior clauses in the Performance Agreements cannot serve as a basis to invalidate the Creator Agreement.

b) <u>The Painter Parties Have Not Sufficiently Alleged Their Breach of Written Contract Claim</u>

The Painter Parties contend that they are entitled to $139,345 in damages for Daniels' breach of the Performance Agreements, "such amount being 50% of the total amount paid to Daniels under his five Performance Agreements, as damages for Daniels' repeated material

25

violations of the Conduct & Behavior clause in those agreements, including without limitation throwing chairs, bottles, and other objects, yelling profanities, slamming doors, making walls collapse, knocking over tables of food, being repeatedly late for shows because he was sleeping and instructed his assistants not to wake him up, repeated sexual harassment against cast/crew and their partners, and death threats against Simon Painter."  Painter Parties' Findings, at 51 (¶ 2).

The Painter Parties, however, have not established that they suffered any damages as a result of Daniels' alleged breach of the Performance Agreements.  "Damages are, of course, a necessary element of the breach of contract cause of action."  *Navellier v. Sletten*, 106 Cal. App. 763, 775 (2003) (holding that a breach of contract claim "should have been stricken because plaintiffs have not substantiated any damages for the breach of contract").

Indeed, instead of pursuing legal action against Daniels as a result of the alleged death threat, the Painter Parties exchanged emails regarding the comical nature of the exchange between Daniels and Painter.  *See, e.g.*, TX 1071 (Sanford stated, "No way this will end up in court. . . . If we do go balls to the wall, make sure the cameras are running, as this will make for good reality tv!").  Similarly, the Painter Parties neither issued a notice of default to Daniels nor pursued legal action against Daniels as a result of his other behavior, behavior which supposedly constituted a breach the Performance Agreements.

Finally, the Painter Parties provide no reasoned basis for their claimed $139,345 in damages.  Indeed, the Performance Agreements say nothing about the damages owed to the Painter Parties if Daniels breached the agreements (i.e., there are no liquidated damages provisions in the Performance Agreements).  Indeed, the Painter Parties fail to explain how the $139,345 figure places them in the same position they would have been had Daniels not allegedly violated the Conduct & Behavior clauses.  *See* CLMTS 6, 7, 8, 9, 10, 11.

Accordingly, while Daniels' conduct may very well have been reprehensible and unprofessional, the Painter Parties have not sufficiently established damages resulting from the alleged breaches for them to be successful on this cause of action.  *See Amelco Elec. v. City of Thousand Oaks*, 27 Cal. 4th 228, 244-245 ("Recovery of damages for a breach of contract is not allowed unless acceptable evidence demonstrates that the damages claimed resulted from and

26

were caused by the breach") (internal quotations and citations omitted); *Greenwich S.F., LLC v. Wong*, 190 Cal. App. 4th 739, 760 (2010) ("[n]o damages can be recovered for breach of contract which are not clearly ascertainable in both their nature and origin") (internal quotations omitted).

Therefore, the Painter Parties' breach of written contract cause of action fails.

### i. *Violation of the Talent Agencies Act*

The Painter Parties argue that "all agreements between [the] Painter Parties and Daniels which may provide for any purported obligation by [the] Painter Parties, or any of them, to pay Daniels money or other benefits in connection with the Illusionists generally, including the Other Illusionists Productions, [ ] are void *ab initio*, pursuant to the California Talent Agencies Act." Painter Parties' Findings, at 52 (¶ 3). More specifically, the Painter Parties claim that because Daniels was not a licensed talent agent, and because the "Talent Agencies Act prohibits a person from engaging in the occupation of a talent agent without first obtaining a license," Daniels cannot profit—receive his 10% fee—from acting as a talent agent for the Show. Painter Parties' Findings, at 27-28.

The Talent Agencies Act ("TAA"), codified at Labor Code §§ 1700, *et seq.*, is a California statute designed to protect artists seeking professional employment from the abuses of talent agencies. *Styne v. Stevens*, 26 Cal. 4th 42, 50 (2001); *Waisbren v. Peppercorn Prods., Inc.*, 41 Cal. App. 4th 246, 254 (1995) ("The Act is a remedial statute …. Such statutes are enacted for the protection of those seeking employment [i.e., the artists] . . . to ensure the personal, professional, and financial welfare of artists."). The TAA's licensing requirement applies to individuals acting on behalf of an artist to procure employment. Lab. Code § 1700.4(a); *see also Cameron v. Donaldson*, TAC No. 3-94, 2 (Cal. Lab. Com., Jul. 15, 1994) (holding that to be considered an agent one must perform work "on behalf of" the artists themselves). Persons employed or working to retain artists for or on behalf of a specific production, such as a casting director or an employee of a production company, are not required to be licensed. *Chinn, et al v. Tobin*, TAC No. 17-96, at 8 (Cal. Lab. Com., Mar. 26, 1997); *Id.* at 8 ("Indeed, there is no requirement that a casting director employed by a production company and who works exclusively for that production company be licensed as a talent agent in order to hire actors to

27

work for that production company."); *Id.* at 7 ("We can find nothing in the legislative history of the Talent Agencies Act that would even remotely indicate any legislative intent to require the licensing of employers who directly offer employment to artists, and to construe the Act in such a manner would lead to absurd results."). The key inquiry here is thus whether the talent agent worked for the talent or simply hired the talent on behalf of the production.

The Arbitrator finds that the TAA does not apply to the Creator Agreement because Daniels was acting on behalf of the Painter Parties and the Show, not the performers (talent). In other words, Daniels functioned in a role similar to a casting director for the Show, and, therefore, he did not need to be licensed under the TAA when recruiting and booking the Show's talent. *See Chin,* TAC NO. 17-96, at 8.

The Painter Parties sought Daniels' help to scout, recruit, and book the performers for the Show. TX 854, 895, 896. Indeed, Daniels' extensive experience in the magic industry and personal relationships with performers around the world were key assets he brought to the production team. Painter told magician Kevin James on May 29, 2011, "Brett D is acting as *my booking agent* and Illusion Director for this production." TX 834 (emphasis added). Furthermore, each magician who testified in the Arbitration confirmed that throughout the course of his involvement with *The Illusionists*, Daniels acted on behalf of the Show, not the acts. TX 731 (Kalins); Sperry Depo. Tr. at 40:8-13; James Depo. at 60:24-25; Hobson Depo. at 24:7-18. In particular, Dan Sperry testified that he was "not aware" of a single "instance where Brett acted as an agent for a particular act opposed to the Show," and confirmed that Daniels never acted as his (Sperry's) agent. Sperry Depo. Tr. at 40:8-13. Similarly, the Kalins sent Daniels a letter on November 12, 2013 stating, "You are not an agent or manager of Kalin & Jinger." TX 731.

Additionally, the Painter Parties used Daniels to *lower* the performers act fees. *See* Daniels' Findings, at ¶ 330. Daniels advocated firing expensive performers and creating a "pipeline" of new talent so the Show could secure lower priced talent without becoming tied to famous, expensive performers. *Id.* at ¶ 331. These facts support the notion that Daniels worked for the production—the Painter Parties, not the talent. The Painter Parties TAA expert, Jeff Robin, testified that a talent agent would never seek to have talent terminated from a show or

suggest a reduction of talent's pay, but a casting director would certainly take these actions as they are working towards the best interest of the production itself.  *Id.* at ¶ 321.  The Arbitrator notes that the existence of miscellaneous email correspondence where Daniels identified himself as an "agent" who receives a "management fee" is not dispositive here.  As the Painter Parties concede, the TAA establishes its scope through a functional, not a titular, definition.  "It regulates *conduct,* not labels."  Painter Parties' Findings, at 28 (¶ 11).  Daniels' conduct was that of a producer or even casting director, but not a talent agent.

 Mr. Robin also testified that all cases of which he was aware under the TAA exclusively involve disputes between talent and an individual acting as a talent agent.  *Id.* at ¶ 317.  Here, the dispute does not involve the talent; rather, it is a dispute between the producers of the Show and its co-creator.  It would be an odd result that the very tasks the Painter Parties asked Daniels to perform—namely identify, recruit, negotiate, and book talent for the Show, would be the reasons the Painter Parties could employ to deny Daniels compensation for his services.  This result is inequitable.  *See* Cal. Civ. Code § 3517 ("No one can take advantage of his own wrong."); *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 52 (1992) (stating the doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.").

Accordingly, the Painter Parties' claim for violation of the TAA fails.

### ii.    *Unfair Competition and False Advertising*

The Painter Parties argue that Daniels violated California's Business and Professions Code by participating in deceptive and misleading advertising campaigns regarding the ensemble magic show he produced—*The Revollusionists*.  As a result of Daniels' unfair business practice, the Painter Parties claim that they have suffered monetary damages between $20,000 to $50,000 per week because *The Illusionists* cannot now play in the geographic region where *The Revollusionists* had its short run.

To prove a violation of Business and Professions Code § 17200's false advertising provision, a claimant must show that (1) the respondent engaged in unfair, deceptive, untrue or

29

misleading advertising, and (2) the claimant suffered injury in fact and lost money or property. *See Buckland v. Threshold Enters., Ltd.*, 155 Cal. App. 4th 798, 819 (2007).

The Painter Parties specifically take issue with an April 11, 2014 press release in which Daniels was identified as the co-creator, co-producer, and director of *The Illusionists*.  Painter Parties' Findings, at 31 (¶¶ 28-29).  The Painter Parties also take issue with press articles issued on April 16, 2014 and May 20, 2014, which declare that *The Revollusionists* is a "spinoff" of *The Illusionists*.  *Id.* at 31 (¶ 31).  Painter and Lawson testified that as a result of *The Revollusionists* deceptive press practices and unprofitable performances, *The Illusionists* cannot now play in Branson, Missouri—the city where *The Revollusionists* debuted.  Painter and Lawson assert that *The Illusionists* could have netted $20,000 to $50,000 per week in Branson, Missouri.

The Arbitrator, however, finds that the Painter Parties have not established injury in fact. Setting aside the alleged inaccuracy of the press releases, or whether the press releases could support a false advertising claim, which would in itself be a difficult proposition to carry, Painter's and Lawson's testimony regarding what *The Illusionists* might have done in Branson, Missouri is entirely speculative.  *Grupe v. Glick*, 26 Cal. 2d 680, 693 (1945) ("[T]he general principle [is] that damages for the loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent.").

First, considering *The Revollusionists* failed in just 2 months and Daniels lost money on the production (Daniels' Findings, at ¶ 349), it is questionable whether *The Illusionists* would have fared better in the Branson, Missouri market.  Second, the Painter Parties did not present any evidence that *The Illusionists* had plans to tour in Branson, Missouri, or ever attempted to obtain an engagement in the city.  These facts undercut the Painter Parties' claim that they suffered any monetary damages from the alleged unfair competition in Branson by Daniels.

For these reasons, the Arbitrator denies the Painter Parties' false advertising claim.

### iii.   *Common Law Trademark Infringement*

The Painter Parties allege that Daniels committed trademark infringement when he co-produced a magic show called "*The Revollusionists*."  The Painter Parties claim that the "similarity in the genre (magic/illusions) and format (ensemble) of the two shows, the

30

confusingly similar show names, the confusingly similar marketing key art (multiple magicians spread evenly across the photo which was allegedly unique to *The Illusionists*), the false statements in the press release and press statements to reporters for *The Revollusionists* … all created the likelihood of a false association between the two shows in the minds of reasonable consumers." Painter Parties' Findings, at 34 (¶ 46).

To prevail on a trademark claim under the Lanham Act or common law, a plaintiff must demonstrate (1) ownership of a valid mark, (2) use by the defendant of the same or similar mark, and (3) that there is a likelihood of confusion. *Alchemy II, Inc. v. Yes! Ent't Corp.*, 844 F.Supp. 560, 570 (C.D. Cal. 1994). When a mark is not registered, as is the case here, the plaintiff must "establish his right to exclusive use in a common law infringement action, such as by proving that the mark is not generic, and that no one else had first used it in commerce." *Applied Information Sciences Corp. v. eBAY, Inc.*, 511 F.3d 966, 970 (9th Cir. 2007) (internal citations and quotations omitted). Additionally, to establish the third element—likelihood of confusion—the plaintiff must show that when customers view the alleged infringing mark, they would assume the mark (and thus the product) is somehow associated with a different product using a similar mark. *See Winchester Mystery House, LLC v. Global Asylum, Inc.*, 210 Cal. App. 4th 579, 594 (2012).

"Likelihood of confusion is a factual determination." *Id.* (citation omitted). In determining whether confusion is likely, the following factors are relevant: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product line. *AMF Inc. v. Sleekraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). "The list of factors is not a scorecard—whether a party 'wins' a majority of the factors is not the point. Some factors are much more helpful than others, and the relative importance of each individual factor will be case specific. [I]t is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." *Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir.2002) (citations and internal quotations omitted).

The Arbitrator notes that neither the Painter Parties nor Daniels conducted a *Sleekraft*

31

factor analysis.  The Arbitrator does so here and finds that the Painter Parties cannot sufficiently

establish the "likelihood of confusion" element.

### 1) Strength of the Mark

"Trademark law offers greater protection to marks that are 'strong,' i.e., distinctive.  The

strength of a mark is determined by its placement on a 'continuum of marks from 'generic,'

afforded no protection; through 'descriptive' or 'suggestive,' given moderate protection; to

'arbitrary' or 'fanciful' awarded maximum protection.'" *E. & J. Gallo Winery v. Gallo Cattle

Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992) (quoting *Nutri/Sys., Inc. v. Con–Stan Indus., Inc.*, 809

F.2d 601, 605 (9th Cir.1987)).  *The Illusionists* mark is "descriptive," meaning that it describes its

product—an ensemble magic show.  However, it is not particularly strong as the term

"illusionist" is rather common, particularly in the magic/entertainment industry.  Indeed, Lawson

testified that when the Painter Parties attempted to apply for a trademark, the USPTO denied the

application as the term "ILLUSIONISTS" was commonplace.  Daniels' Findings, at ¶ 356.

Furthermore, the *The Illusionist* mark is rather generic—using general font without unique

artistry.  *See* CLMTS 47.  This factor thus weighs against the Painter Parties' ability to establish a

likelihood of confusion.

### 2) Proximity of Goods

"For related goods, the danger presented is that the public will mistakenly assume there is

an association between the producers of the related goods, though no such association

exists." *Sleekcraft*, 599 F.2d at 350.  Here, *The Illusionists* and *The Revollusionists* are both

ensemble magic shows.  Because of the similarity between the shows, this factor weighs in favor

of finding a likelihood of confusion.

### 3) Similarity of the Marks

"Similarity of the marks is tested on three levels: sight, sound, and meaning.  Each must

be considered as they are encountered in the marketplace.  Although similarity is measured by the

marks as entities, similarities weigh more heavily than differences." *Sleekcraft*, 599 F.2d at 351.

Here, *The Illusionists* and *The Revollusionists* marks are not similar.  The font, coloring, and

sound of the marks are sufficiently distinct.  *Compare* CLMTS 47 *with* CLMTS 59.  While the

32

meaning of the two marks may be similar (i.e., a magic show featuring illusionists), the marks are inherently distinct in look and sound.  Therefore, this factor weighs against finding a likelihood of confusion.

### 4)    Evidence of Actual Confusion

"Evidence that the use of the two marks has already led to confusion is persuasive proof that future confusion is likely."  *Sleekcraft*, 599 F.2d at 352.  Because *The Revollusionists* failed in just two months, it is highly unlikely that consumer confusion resulted.  In any event, the Painter Parties failed to produce evidence, such as consumer surveys, affidavits from confused consumers, or expert opinions regarding actual confusion or the likelihood of confusion between *The Illusionists* mark and *The Revollusionists* mark.  Consequently, this factor weighs against finding a likelihood of confusion.

### 5)    Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion."  *Sleekcraft*, 599 F.2d at 353.  "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products."  *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir.2014).

*The Revollusionists* ran for only two months in 2014 in a regional theater in Branson, Missouri.  Daniels' Findings, at ¶ 350.  Even the Painter Parties stated it was a "relatively short lived" show that "failed."  Daniels' Findings, at ¶ 352.  Notably, the Painter Parties did not produce any evidence of convergent marketing channels.  Despite the Painter Parties taking issue with certain press campaigns conducted by Daniels in promoting *The Revollusionists*, the Painter Parties did not argue that *The Revollusionists* was advertised through the same mediums as *The Illusionists*.  And, given the small market that *The Revollusionists* temporarily occupied, convergent marketing channels is unlikely.  Additionally, the record shows that *The Illusionists* never toured Branson, Missouri and had no plans to tour that location, further confirming that *The Illusionists* was not advertised through channels that *The Revollusionists* utilized.  Daniels' Findings, at ¶ 352.  Accordingly, this factor weighs against finding a likelihood of confusion.

33

6)   Types of Goods and Degree of Care Likely to Be Exercised by the Purchaser

"We examine the relatedness of the parties' goods because the more closely related the goods are, the more likely consumers will be confused by similar marks ... Related goods are those products which would be reasonably thought by the buying public to come from the same source if sold under the same mark.  In practice, this definition does not necessarily require a close proximity before goods will be found related." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1147 (9th Cir.2002) (citations and quotations omitted).

*The Illusionists* and *The Revollusionists* are both ensemble magic shows that featured Brett Daniels, a world-class magician.  While ensemble magic shows are not a "common consumer item," a reasonable consumer would likely not research whether both shows originated from the same source, i.e., the Painter Parties, and instead assume that because Daniels is a performer, that the shows are related.  *See, e.g.*, *Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173, 1183 (E.D. Cal. 2016).  Furthermore, because tickets to *The Revollusionists* started at just $5.00 (CLMTS 54), consumers would likely not exercise a high degree of care in scrutinizing the difference between *The Revollusionists* and *The Illusionists*.  For these reasons, this factor weighs in favor or finding a likelihood of confusion.

7)   Defendant's Intent in Selecting the Mark

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekraft*, 599 F.2d at 354.  Without reference to the record, the Painter Parties claim that Daniels "testified that in creating the press campaign and marketing for *The Revolutionists* … he intentionally sought to create an association between that show and *The Illusionists* …."  Daniels does not provide any specific argument in response, but he does generally deny the allegation.  The Arbitrator thus finds that this factor slightly weighs in favor of finding a likelihood of confusion.

8)   Potential Expansion of the Product Line

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a

34

FINAL AWARD

"strong possibility" that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing.  *Id.*  Because *The Revollusionists* failed in just two months, and because the show did not restart or expand to different markets, there is no chance that *The Revolutionists* mark will expand and compete with *The Illusionists* mark.  Therefore, this factor weighs against a finding of a likelihood of confusion.

### 9)   Balance of the Factors

The majority of the factors weigh against finding a likelihood of confusion.

Further, the paucity of evidence offered by the Painter Parties in support of their claim— particularly, the failure to offer any evidence of actual confusion—results in the Arbitrator denying the Painter Parties' trademark infringement claim.

### iv.   *Common Law Trade Dress Infringement*

The Painter Parties allege that they own a protectable trade dress in the design and element combination for their ensemble magic show—*The Illusionists*.  Painter Parties' Findings, at 35 (¶ 51).  They also claim to own a protectable trade dress in the marketing for their shows— marketing which uses a formation of magicians lined up in a manner similar to "superheroes of magic."  *Id.* at 35 (¶ 52).

Trade dress is the "appearance of the product and may include features such as size, shape, color, color combinations, texture, or graphics."  *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir. 1987).  To recover on a claim of trade dress infringement, a plaintiff must prove: (1) that the alleged trade dress is either inherently distinctive or has acquired secondary meaning; (2) that the trade dress is not functional; and (3) that the defendant's product creates a likelihood of confusion by members of the consuming public.  *See* 15 U.S.C. § 1125(a)(1)(A); *Rachel*, 831 F.2d at 1505-06.

The Arbitrator finds the Painter Parties offer only conclusory statements, not facts or evidence in support of their trade dress claim.  First, the Painter Parties failed to produce evidence establishing that the Show's design, elements, and marketing acquired secondary meaning. "Indicia of secondary meaning include advertising expenditures, consumer studies linking the name to a source, sales success, unsolicited media coverage of the product, attempts to plagiarize

35

1    the mark, and length and exclusivity of the mark's use." *Morgan Creek Prods., Inc. v. Capital*

2    *Cities/ABC, Inc.*, No. CV-89-5463-RSWL (JRX), 1991 WL 352619, at *10 (C.D. Cal. 1991)

3    (citation omitted).  The Painter Parties failed to offer facts and supporting evidence in support of

4    these "indicia of secondary meaning."  *Jeffrey Millstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58

5    F.3d 27, 32 (2d Cir. 1995) (trade dress protection does not extend to merely "an idea, a concept or

6    a generalized type of appearance.").

7         Second, just like the trademark claim, the Painter Parties failed to produce evidence, such

8    as surveys, consumer affidavits, or expert opinion regarding actual confusion or the likelihood of

9    confusion between *The Illusionists'* trade dress and *The Revollusionists'* trade dress.  In fact,

10   Lawson testified that he had no evidence of actual consumer confusion between *The Illusionists*

11   and *The Revollusionists*.  Daniels' Findings, at ¶ 356.

12        Therefore, the Painter Parties' common law trade dress infringement claim is denied.[3]

13                        **v.   *Declaratory Relief***

14   The Painter Parties request that the Arbitrator declare the following:

15   •   The Painter Parties have no obligation to pay Daniels any compensation pursuant

16       to the March 17, 2012 written agreement between Painter and Daniels;

17   •   If there was an agreement to pay Daniels (the Creator Agreement), it is void *ab*

18       *initio* by virtue of the Talent Agencies Act;

19   •   Daniels breached the "measure of expectation" that he and Painter agreed to by

20       ceasing to provide services as of July 2013; and

21

22

23   [3] With respect to the Painter Parties's claims and defenses, as the Arbitrator found in Order No. 5, the lack of documentary evidence in support thereof is significant.  The Painter Parties' failure to produce relevant documents, especially Email correspondence from Painter and Lawson during the key time period, whether due to problems in

24   retrieving them or because they took a broad view of applicable privileges, goes directly to the weight and persuasiveness of their arguments.  *See, e.g.*, *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 214 (S.D.N.Y. 2003)

25   ("The absence of such documentary proof may stymie the search for the truth."); *Parrick v. FedEx Ground Package System, Inc.*, No. CV 09-95-M-DWM-JCL, 2010 WL 3724825, at *5 (D. Mont. Sept. 17, 2010) ("The rationale

26   supporting the imposition of sanctions stems, in part, from the 'presumption that refusal to produce evidence [ … is] but an admission of the *want of merit in the asserted defense*.'") (citation omitted) (emphasis added); *Computer*

27   *Assoc.'s Int'l, Inc. v. Am. Fundware, Inc.*, 133 F.R.D. 166, 170 (D. Colo. 1990) ("It is familiar doctrine that if a party fails to produce from within its control evidence that is relevant and material, the fair inference is that that evidence

28   would have weighed against the party who held it back.").

FINAL AWARD

- Daniels "egregiously breached" the Parties' Performance Agreements by threatening to kill Painter.

Painter Parties' Findings, at 36 (¶ 61).

Based on the Arbitrator's findings above, each of these requests for declaratory relief are denied.

With respect to Daniels' claim for breach of the purported "TV Agreement," Daniels concedes that he is "no longer pursuing that claim." Painter Parties' Findings, at 37 (¶ 63); Daniels' Findings, at ¶ 216(d). Accordingly, that claim is denied and the Painter Parties' request for declaratory relief is also denied as moot.

**Damages**

**i.** **_Breach of Contract Damages_**

"The basic object of damages is compensation, and in the law of contracts the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance." *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442, 455 (1990). "The aim is to put the injured party in as good a position as he would have been had performance been rendered as promised." *Id.*

As discussed *supra*, Daniels is entitled to damages from the Painter Parties' breach of Creator Agreement—namely, in an amount equal to 10% of the total act fee budget for all variations of the Show performed to date. The Parties are in general agreement regarding the amount owed to Daniels for *past* damages through 2017. Daniels' expert, Renee K. Howdeshell, determined that he is entitled to $845,803.00. *See* Expert Report of Renee K. Howdeshell (Jan. 17, 2018) ("Howdeshell Report"), at Exhibit 2. The Painter Parties' expert, Jan. L. Goren, concluded that, should Daniels prevail on his breach of contract claim, he is entitled to $845,802.00 in past damages—$1 dollar less than Daniels' expert. *See* Final Rebuttal Report of Jan L. Goren (Jan. 24, 2018) ("Goren Report"), at 2-3; *see also id.* at 2 ("I have reviewed Fulcrum's expert report and concluded that there are only minor differences (in both directions) between our respective accounting of payments to magicians.").

Based on this negligible difference in the expert reports, I find that Daniels is entitled to

37

$845,803.00 in past damages for his breach of contract claim.

### ii.    *Interest on Past Contract Damages*

"Prejudgment interest is an element of complete compensation[.]" *See West Virginia v. United States*, 479 U.S. 305, 310 (1987).  Pursuant to California Civil Code § 3289, prejudgment interest should be awarded for a breach of contract at a rate of "10 percent per annum after breach" if the contract was entered into "after January 1, 1986 [and] does not stipulate a legal rate of interest."  Cal. Civ. Code § 3289(b).

Here, the Creator Agreement does not contain a stipulated legal rate of interest. Therefore, exercising my discretion, the Arbitration finds that 10 percent is the appropriate interest rate to apply in the prejudgment interest calculation.  Daniels' expert, Ms. Howdeshell, accurately performed the prejudgment interest calculation in her report, calculating prejudgment interest at 10 percent and only after breach and only on past amounts owed to Daniels.  *See* Howdeshell Report, at Exhibit 11.

Thus, the Arbitrator accepts Ms. Howdeshell's finding that Daniels is entitled to a prejudgment interest award totaling $181,031.00.

### iii.    *Expectancy Damages – 10% for All Variations of the Show "In Perpetuity"*

Lost profits may be recoverable as damages for breach of a contract.  Lost profits are generally recoverable when they are "foreseen or foreseeable as reasonably probable to result from the [ ] breach."  *See Lewis Jorge Const. Mgmt. v. Pomona Unified School Dist.*, 34 Cal. 4th 960, 977 (2004).  The California Supreme Court in *Sargon Enters., Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 773-74 (2012) stated:

> '[T]he general principle [is] that damages for the loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent.' (*Grupe v. Glick* (1945) 26 Cal.2d 680, 693.) Such damages must 'be proven to be certain both as to their occurrence and their extent, albeit not with 'mathematical precision.'' (*Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 975.) The rule that lost profits must be reasonably certain is a specific application of a more general statutory rule. 'No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin.' (Civ. Code, § 3301; see *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 760 [118 Cal.Rptr.3d 531])

38

1   *Id.* at 774-75.  The Supreme Court went on to say:

2         Where the *fact* of damages is certain, the amount of damages need not be
calculated with absolute certainty. [Citations.] The law requires only that some
3         reasonable basis of computation of damages be used, and the damages may be
computed even if the result reached is an approximation. [Citation.] This is
4         especially true where ... it is the wrongful acts of the defendant that have created
the difficulty in proving the amount of loss of profits [citation] or where it is the
5         wrongful acts of the defendant that have caused the other party to not realize a
profit to which that party is entitled. (*GHK Associates v. Mayer Group, Inc.* (1990)
6         224 Cal.App.3d 856, 873–874] [permitting an award of profits calculated from a
project's "*actual* income"].)
7

8   *Id.* at 774-75.  Finally, the Supreme Court noted:

9         The lost profit inquiry is always speculative to some degree. Inevitably, there will
always be an element of uncertainty …. Courts must not eviscerate the possibility
10        of recovering lost profits by too broadly defining what is too speculative. A
reasonable certainty only is required, not absolute certainty.
11

12   *Id.* at 775.

13       Historical data, such as past business volume, as well as the profits of similar businesses

14   operating under similar conditions may be used to provide a proxy of future damages.  *Id*; *see*

15   *also Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 883 (2002) ("[W]here the operation of

16   an *established business* is prevented or interrupted, as by a tort or breach of contract or warranty,

17   damages for the loss of prospective profits that otherwise might have been made from its

18   operation are generally recoverable for the reason that their occurrence and extent may be

19   ascertained with reasonable certainty from the past volume of business and other provable data

20   relevant to the probable future sales.").

21           *a.*     Contracts in Existence – 2017 to March 2018

22       The Arbitrator finds that Daniels is entitled to damages for unpaid, existing contracts for

23   the Show's variations through March 2018.  The amount over past damages, as calculated by

24   Daniels' expert, through the end of March 2018, is $198,582.00.  *See* Howdeshell Report, at 5,

25   Exs. 7 & 8.  This amount is calculated from existing contracts, and therefore, it is not speculative

26   or conjectural.  In other words, even though the contracted amounts have not been paid to the

27   performers, the existence of the contracts makes calculation of 10% of the total cumulative act fee

28   budget a reasonable computation.  *Sargon Enters. Inc.*, 55 Cal. 4th at 774 ("The law requires only

39

that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.").

The Arbitrator, thus, finds that Daniels is entitled to breach of contract damages through the end of March 2018, in the amount of $198,582.00.

b.    April 2018-2023 Contracts

With respect to future damages, not based on existing contracts, Daniels provides the arbitrator with six, alternative future damages calculations:

- $3,248,060.94 in future damages (10% of the total cumulative act fee budget, applying the actual 20% growth between 2016 and 2017, and carried forward for six years); or

- $2,313,450.05 in future damages (10% of the total cumulative act fee budget, with a more modest 10% growth on the act fees owed to Daniels throughout the 2017 calendar year and carried forward for six years); or

- $1,635,492.00 in future damages (10% of the total cumulative act fee budget with no growth, carried forward for six years); or

- $6,643,995.84 (calculated based on profits for solely The Works, with no growth, for six years); or

- 6% of net profits from all variations of The Illusionists (as defined above) paid as earned, in perpetuity.

Daniels' Findings, at 8 (¶ 2(c)).

Five of Daniels' proposed calculations seek a lump sum payment based on estimating Daniels' damages for the next six years. *Id.* In other words, Daniels concedes by his submission that in a lump sum award situation the outer limit of reasonable damages is six years.

One of Daniels' calculations seeks a continuous accounting: 6% of net profits from all variations of *The Illusionists* paid as earned, in perpetuity. *Id.* The Arbitrator, however, declines to implement the continuous accounting, i.e., awarding Daniels 6% of net profits from all variations of the *The Illusionists* in perpetuity. First, a continuous accounting violates the time-honored principle that future damages should only be recovered when "their occurrence and

40

extent may be ascertained with reasonable certainty." *Kids' Universe*, 95 Cal. App. 4th at 883; *see also Allergan Sales LLC v. UCB, Inc.*, CV-01001-JRG-RSP, 2016 WL 8222619, at *1 (E.D. Tex. Nov. 7, 2016) ("When compensatory damages move an injured party beyond the status quo ante, projected future loss must be factually and proximately caused by a wrong (such as a tort) that has *already occurred.*").  Second, a continuous accounting regime could lead to "a multiplicity of suits, time, and expense, and promotes the ends of justice." *See Providence Rubber Co. v. Goodyear*, 76 U.S. 788, 801 (1869); *see also Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1386 (Fed Cir. 2001) (affirming, as being supported by substantial evidence, $1 million award for patent infringement based on a reasonable royalty of a lump-sum payment equal to 10% of gross revenues covering a period of five years).[4]

In addition to being preferable to a continuous accounting regime for reasons of judicial economy, a lump-sum, future damages award is reasonable because the Painter Parties should have foreseen that any breach of the Creator Agreement would expose them to liability for future damages. *See Lewis Jorge Const. Mgm't, Inc.*, 34 Cal. 4th at 977 (noting that future damages may be awarded if they were foreseen or reasonably foreseeable).

In this case, as early as November 21, 2010, Painter described the opportunity that later became *The Illusionists* as a show with "MASSIVE opportunity for global expansion" for which Daniels "would receive a percentage of future earnings."  Daniels' Findings, at ¶ 13.  On December 20, 2010, Painter also predicted that this opportunity would become a "GLOBAL sensation." *Id.*  Most importantly, the Creator Agreement explicitly states that Daniels shall receive "on an ongoing basis, in perpetuity, 10% of the total 'act fee budget'" from *The Illusionists* and any of its variations. *Id.* at ¶ 15.

On April 29, 2011, Painter informed Daniels that he believed the Show could go on for "years" if it debuted well at the Sydney Opera House.  TX 847.  Painter further noted in February 2012, when the Parties were negotiating Daniels' contract, that "its [sic] mainly about [Painter]

---

[4] *See, e.g.*, 4 Annotated Patent Digest § 30:90 (2018) (noting that a lump-sum payment removes the risk that the defendant may engage in financial underreporting, thereby decreasing the future royalties owed to the aggrieved party).

41

receiving 10% of the act fees (regardless of whether [the performers] pay you or I do) *for the perpetuity* of the Illusionists project."  (TX 849) (emphasis added).

The Arbitrator finds that a lump-sum damages award is appropriate to compensate Daniels for the loss of his future profits and promotes judicial efficiency by reducing the risk of future litigation among the parties arising out of accounting and other disputes.  I decline, however, to adopt any of Daniels' proposed lump-sum calculations.

The Arbitrator, exercising his discretion, finds that Daniels is entitled to $1,381,871.40 for years 2018 through 2023.  The Arbitrator took the 2017 act fee budget of $2,634,089 (*see* Howdeshell Report, at Ex. 2) and extended it for 6 years through 2023.  The total cumulative act fee budget for 2018 through 2023 is thus $15,804,534.  Taking 10% of that figure, the amount owed to Daniels pursuant to the Creator Agreement, is $1,580,453.40.  Subtracting the $198,582 calculated by Howdeshell (*see supra* D(iii)(a)) and already awarded to Daniels through March 2018, the remaining amount owed to Daniels through 2023 is $1,381,871.40.  *See Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 401-02 (5th Cir. 2013) (although presentation of damages "was far from ideal," from the sales data presented, a fact finder could reasonably arrive at an estimation of future lost profits); *Eastern Mountain Platform Tennic, Inc. v. Sherwin-Williams Co., Inc.*, 40 F.3d 492, 503 (1st Cir. 1994) ("The evidence produced concerning future profits was not precise, but it was sufficient to enable the jury to project and calculate the [future lost profit] amount.").

Accordingly, Daniels is awarded an additional $1,580,453.40 in breach of contract damages covering the period from April 2018 through the end of 2023.

## V.   **AWARD**

Based on the foregoing, and pursuant to Rule 47(a) of the AAA Rules, which provides, "[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties," I find Daniels is entitled to the following damages for his breach of contract claim:

42

| Contract Damages (Past) | $845,803.00 |
|---|---|
| Prejudgment Interest on Contract Damages | $181,031.00 |
| Contract Damages Owed on Existing Contracts through March 2018 | $198,582.00 |
| Contract Damages (Future: 2018-2023) | $1,381,871.40 |
| TOTAL | $2,607,287.40 |

Accordingly, the Painter Parties shall pay Daniels a total sum of $2,607,287.40 within 30 days of the issuance of this Award.

Pursuant to California Code of Civil Procedure § 685.010, "interest accrues at the rate of 10 percent per annum on the principal amount of a money judgement remaining unsatisfied." Therefore, should there be a delay in satisfying the $2,607,287.40 award to Daniels beyond thirty (30) days from the issuance of this award, Daniels shall be entitled to post-judgment interest at a rate of 10 percent per year.

## VI.   ATTORNEYS' FEES AND COSTS

### A.   Attorneys' Fees

Neither the Creator Agreement nor the Performance Agreements provide that the prevailing party in this arbitration shall be entitled to attorneys' fees.  Thus, the Arbitrator is not bound to issue an attorneys' fees award.  *See Frog Creek Partners, LLC v. Vance Brown, Inc.*, 206 Cal. App. 4th 515, 523-24 (2012) (noting that to award attorneys' fees in a contract case, the contract at issue must specifically provide for that remedy to the prevailing party); *Hsu v. Semiconductor Systems, Inc.*, 126 Cal. App. 4th 1330 (2005) (same); Cal. Civ. Code § 1717(a) (permitting attorneys' fees in a contract action where the contract specifically provides for the award of attorneys' fees to the prevailing party).

In American civil litigation, unless altered by statute or contract, "each party to a lawsuit ordinarily pays its own attorney fees."  *Burkhalter Kessler Clement & George LLP v. Hamilton*, 19 Cal. App. 5th 38, 43 (2018).  The Arbitrator shall not deviate from this time-honored American rule.  *See Retzloff v. Moulton Parkway Residents' Assoc., No. One*, 14 Cal. App. 5th 742, 749 (2017) ("California generally follows what is commonly referred to as the 'American Rule,' which provides that each party to a lawsuit must ordinarily pay his or her own attorney

43

fees.").

Accordingly, the Arbitrator declines to award attorneys' fees to either party.

**B.    Costs**

The types of costs that may be recovered in arbitration are listed in California Code of Civil Procedure § 1033.5.  *See Heimlich v. Shivji*, 12 Cal. App. 5th 152, 165 (2017).  Those costs include travel expenses to attend depositions; taking, video recording, and transcribing depositions; some expert witness fees; court reporter costs; some vendor costs, and demonstratives for use at deposition and the arbitration hearing.  *See* Cal. Code Civ. Proc. § 1033.5.

Here, the Creator Agreement contains no provision regarding arbitration costs, fees, or expenses.  The Performance Agreements, which contain the Parties' agreement to arbitrate, states "The expenses of any arbitration shall be born equally by [the parties] without regard to outcome."  *See, e.g.*, *Moncharsh v. Heily & Blase*, 3 Cal. 4th 1, 9-10 (1992) (stating the powers of the arbitrator are limited and circumscribed by the agreement and/or stipulation of submission).

Accordingly, the Arbitrator declines to award costs to either party. The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling US$20,450.00 and the compensation and expenses of the arbitrator totaling US$145,496.80 shall be borne as incurred.

**VII.    SUMMARY OF RULING**

The Arbitrator enters an award in favor of Daniels and against the Painter Parties.

The Arbitrator orders that the Painter Parties' breach of the Creator Agreement entitles Daniels to a total monetary award of $2,607,287.40.

The Arbitrator also finds that Daniels is entitled to post-judgment interest at a rate of 10% per year, commencing thirty (30) days after the issuance of this award.

The Arbitrator finds that each party shall bear their own fees and costs.

The Arbitrator further orders that:

- The Painter Parties are jointly and severally liable for all damages set forth herein.

44

1        • That the Painter Parties take nothing by way of each of their claims against

2           Daniels.

3        This award is in full settlement of all claims and counterclaims submitted to this

4 Arbitration.

5        I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on

6 the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Los

7 Angeles, California, United States of America.

8

9        IT IS SO ORDERED this 19th day of March, 2018, at Los Angeles, California.

10

11

12                       By: _____

13                         ROBERT C. O'BRIEN

14                         ARBITRATOR

15

16

17

18

19

20

21

22

23

24

25

26

27

28

45

FINAL AWARD